**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

**UNITED STATES OF AMERICA**

– v. –

**GLENN GRIFFIN,**

**Defendant.**

**S1 22 Cr. 390 (VB)**

## THE GOVERNMENT'S SENTENCING MEMORANDUM
## REGARDING DEFENDANT GLENN GRIFFIN

JAY CLAYTON
United States Attorney
Southern District of New York
50 Main Street, Suite 1100
White Plains, New York 10606

David R. Felton
James F. McMahon
Assistant United States Attorneys
    - *Of Counsel* -

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

**UNITED STATES OF AMERICA**

– v. –                                                    **S1 22 Cr. 390 (VB)**

**GLENN GRIFFIN,**

                    **Defendant.**

## GOVERNMENT'S SENTENCING MEMORANDUM
## REGARDING DEFENDANT GLENN GRIFFIN

The Government respectfully submits this memorandum in connection with the sentencing of defendant Glenn Griffin, now scheduled for June 11, 2025 at 2:00 p.m.  As set forth in the Presentence Investigation Report ("PSR") and in the parties' plea agreement (the "Plea Agreement"), the defendant's applicable sentencing range is 37 to 46 months' imprisonment (the "Stipulated Guidelines Range").  For the reasons discussed below, the Government respectfully submits that the Court should specifically enforce the parties' Plea Agreement and that a sentence of (a) 46 months' imprisonment, at the top of the Stipulated Guidelines Range, (b) the stipulated $220,000 forfeiture amount, (c) the stipulated restitution amount of $2,400,000, with $1,200,00 due to the Town of Cortlandt and $1,200,000 due to the Westchester Land Trust, and (d) a fine within the Guidelines range between $15,000 and $150,000, would be appropriate in this case.

## I.      OFFENSE CONDUCT

Defendant Glenn Griffin and his co-defendant Robert Dyckman engaged in a years-long unauthorized dumping scheme.  Dyckman, an assistant general foreman for the Town of Cortlandt, New York, took bribes from Griffin, the owner of a landscaping firm, in exchange for unauthorized access to the Town's Arlo Lane facility.  Griffin took advantage of that access to dump hundreds

of truckloads of unauthorized materials at Arlo Lane from November 2018 to September 2019. These unauthorized materials did not originate from Town of Cortlandt projects, such as leaves from catch-basin repairs; instead, they came from Griffin's unrelated, non-Cortlandt projects, and included thick concrete, cement with rebar, tiles, bricks, large rocks, and soil.  The materials also contained asbestos.

Griffin was the owner, president, and principal of Griffin's Landscaping Corporation ("Griffin's Landscaping") and Hilltop Nursery & Garden Center ("Hilltop," collectively with Griffin's Landscaping, "Griffin's Companies").  Griffin's Landscaping was based in Peekskill, New York, and was a full-service commercial and residential landscaping company providing a variety of construction, removal, landscaping, and masonry services.  Hilltop was based in Croton-on-Hudson, New York, and as a purveyor of gardening supplies, trees, shrubs, soil, and mulch. Griffin's Companies have held a variety of municipal contracts with the Town of Cortlandt Manor, New York, the village of Croton-on-Hudson, New York, the hamlet of Verplanck, New York, and New York City, New York.  (PSR ¶ 11).

Dyckman was a Town of Cortlandt public employee for over 25 years until his October 2019 departure.  At the time of his parting, Dyckman was an Assistant General Foreman employed by the Town of Cortlandt, a position he had held for over seven years, in which he supervised approximately 10 to 15 Town of Cortlandt employees, drivers, and laborers.  In Dyckman's role for the Town of Cortlandt, he was responsible for overseeing, among other services, road maintenance, paving, snow plowing, catch basin drainage repair and maintenance, sweeping, and tree work.  (PSR ¶ 12).

Arlo Lane is a Town of Cortlandt facility that was within Dyckman's purview.  Among

other functions, Arlo Lane stores Town of Cortlandt equipment, machinery, supplies, and materials, such as trucks, loaders, screeners, manhole covers, catch-basin equipment, soil, and bins.  Arlo Lane includes a large salt dome with a large pile of salt.  Vendors and public employees were authorized to deposit and store at Arlo Lane materials originating from Town of Cortlandt projects, such as leaves removed during Town of Cortlandt catch-basin repairs.  But without any connection to authorized Town of Cortlandt projects, materials from private projects or public projects not connected to the Town of Cortlandt were not authorized to be deposited and stored at Arlo Lane, including millings.  Among the work Griffin's Companies performed for the Town of Cortlandt included removing and hauling away piles of materials that had accumulated at Arlo Lane.  (PSR ¶ 13).

<u>Illegal Dumping Scheme</u>

The unauthorized materials dumped by Griffin did not originate from Town of Cortlandt projects, such as leaves from catch-basin repairs; instead, they came from Griffin's unconnected, non-Cortlandt projects, and included thick concrete, cement with rebar, tiles, bricks, large rocks, and soil.  (Dkt. 2 ("Ind.") ¶ 4).  Griffin benefited from the scheme by, among other ways, having a free, nearby location to dump the truck loads of unauthorized materials and, on top of those benefits, receiving payments from the Town of Cortlandt for removing and hauling away some of the very materials that he had dumped there without authorization and with Dyckman's assistance.  (*Id.*); (PSR ¶ 14).

Dyckman generally allowed Griffin and his employees and associates access to Arlo Lane on Saturdays or after working hours.  (PSR ¶ 15).  To carry out the scheme, Dyckman, among other things: (a) ensured that Griffin or his associates could enter Arlo Lane; (b) messaged and

called, using his Town of Cortlandt cell phone, Griffin, to facilitate the unauthorized dumping; (c) attempted to clear senior Town of Cortlandt management from Arlo Lane around the time of the unauthorized dumping in order to conceal it; (d) personally moved the piles of unauthorized dumped materials to conceal the unauthorized dumping; (e) directed certain subordinate Town of Cortlandt workers to assist in  carrying out and concealing the unauthorized dumping; and, (f) to conceal the unauthorized dumping, falsely entered a subordinate Town of Cortlandt worker's overtime hours as having occurred on a weekday when, in truth and in fact, as Dyckman well knew, the subordinate's overtime had occurred, at Dyckman's direction, on a weekend.  (Ind. ¶¶ 5, 10.c.).  The Indictment further detailed numerous occasions in 2018 and 2019 when Dyckman ensured that Griffin and his associates received unauthorized access to Arlo Lane to dump, in total, hundreds of loads of unauthorized materials.  (*Id.* ¶ 10.a.).

The Indictment excerpted numerous text messages in furtherance of the bribery and misapplication and conversion of property offenses.  (*Id.* ¶ 10.b.).  For example:

- On or about November 19, 2018, Dyckman texted an associate, when discussing finances, "I'm seeing Glenn today *I'll have money for food today*."  (*Id.* ¶ 10.b.i.) (emphasis added).

- On or about December 2, 2018, Griffin and Dyckman discussed Griffin's unauthorized dumping and concealing this unauthorized dumping from others that may be at Arlo Lane.  For example, Griffin texted Dyckman, "Can I dump there tmrw a few loads by any chance ?"; Dyckman responded, "Yes just let me know what time"; Griffin responded, "That's great. *I will take care of u for sure*."

Dyckman then cautioned, "Let me see if leader guy is in"; Griffin wrote, "Ok. Do u want to let me know in the Am ?" (*Id.* ¶ 10.b.iii.) (emphasis added).

- On or about December 3, 2018, Griffin and Dyckman continued their discussions of Griffin's unauthorized dumping at Arlo Lane and concealing this unauthorized dumping from others that may be at Arlo Lane. For example, Griffin texted Dyckman, "Pop. I no this is annoying . Can we dump a few loads first thing only tmrw. ??" Dyckman responded, "Yes just give me a time and I will pull him out." Griffin texted Dyckman back, "We will be there 830-900 .. and *I want to take care of u guys I don't want it for nothing. It's a big help to me*." Dyckman noted, "Ok give me 30 min heads up." (*Id.* ¶ 10.b.v.) (emphasis added).

- The next day, on or about December 4, 2018, Griffin and Dyckman continued their discussions of Griffin's unauthorized dumping and concealing this unauthorized dumping from others that may be at Arlo Lane. For example, Griffin texted Dyckman, "930-945 they will be be there ?" Dyckman responded, "Can I do the next round" and "I cant get him out right now." Griffin affirmed, "Ok n p  second round. Ty," and Dyckman responded, "Great just give me heads up so I can pull him out." Griffin asked, "Ok. Is he at arlo ?" Dyckman responded, "Yes I thout we were doing 2nd round." (*Id.* ¶ 10.b.vi.).

- Approximately 30 minutes later, that same day, on or about December 4, 2018, Griffin and Dyckman continued their discussions of Griffin's unauthorized dumping and concealing this unauthorized dumping from others that may be at Arlo Lane. For example, Dyckman alerted Griffin to the presence of a cop with the New

York State Department of Environmental Conservation ("D.E.C." or "DEC"), "D.E.C. cop sitting at our gate."  Griffin responded, "Why ??" and asked, "Should I go talk to him ?"  Dyckman cautioned Griffin against doing so, texting "Nah I think it will look suspicious."  Griffin wondered, "Do u think Someone called on me?" Dyckman advised, "I will try to find out but right now we on hold here."  Ten minutes later, Griffin texted Dyckman, "R u by urself now ?"  Dyckman responded, "Call me."  (*Id.* ¶ 10.b.vii.).

- On or about November 23, 2018, Griffin and Dyckman discussed Griffin's unauthorized dumping and concealing this unauthorized dumping from others that may be at Arlo Lane.  For example, Dyckman texted Griffin, "Hey hold up on some of the trucks coming in okay Chris is coming out"; in response, Griffin asked Dyckman if Chris was "coming to Arlo?"; Dyckman answered in the affirmative; Griffin responded "Oh shit. R u at arlo?" and noted "I will try and redirect"; Dyckman texted "Two of them just left" and "When we did get pretty good at 12 loads in."  Griffin and Dyckman then arranged to meet at Arlo Lane later that day. (*Id.* ¶ 10.b.ii.).

Griffin and Dyckman were arrested on July 21, 2022, and have agreed to pay the Town of Cortlandt and the Westchester Land Trust, a 501(c)(3) tax-exempt organization which owns damaged wetlands abutting the Town of Cortlandt's Arlo Lane property, a total of $2.4 million ($1.2 million to each of the victims) to remediate and restore their property following Griffin and Dyckman's criminal conduct.  (PSR ¶ 17).

Below are examples of images from Arlo Lane surveillance video of trucks associated with

Griffin carrying out the illegal dumping scheme. The images capture the contents of the trucks which include, among other materials, concrete, bricks, and construction and demolition materials.

May 11, 2019





June 8, 2019



July 20, 2019



August 3, 2019





Likewise, Griffin personally appeared at Arlo Lane around the time of dumping operations, including on May 18, July 20, and August 24, 2019.  Here is a photo from surveillance video from July 20, 2019.



As another series of examples, the below photographs show, first, from September 7, 2019, the large size of one pile of Griffin-dumped debris at Arlo Lane.  Then, surveillance videos over the next few days show workers, with the second photograph below from September 11, 2019 as one example, moving Griffin's debris pile toward an Arlo Lane boundary with the Westchester Land Trust's wetlands.  By the last photograph below, also from September 11, 2019, the September 7, 2019 pile at Arlo Lane is gone, having been dumped into the wetlands.

September 7, 2019



September 11, 2019





Finally, below are photographs from July 2023 provided by the Westchester Land Trust of some of the unlawfully dumped materials as part of Dyckman and Griffin's crimes, which are plainly not authorized items, such as leaves removed during Town of Cortlandt catch-basin repairs.





13



After Dyckman left his Town of Cortlandt job, from October 2019, up to February 2020, Griffin assisted Dyckman in identifying and obtaining new employment. Griffin recommended Dyckman for employment at a Bronx-based employer with whom Griffin had an established relationship. In or around February 2020, Dyckman was hired by this Bronx-based employer.

The parties stipulated in the plea agreement that the loss to the Town of Cortlandt was $1,200,000. The parties also stipulated that the Westchester Land Trust, which owns a nature preserve adjoining the Arlo Lane facility, suffered an additional loss of $1,200,000 because construction debris, including asbestos containing materials, was pushed onto their land from Arlo

Lane.

Bid-Rigging Scheme

Griffin also engaged in a separate bid-rigging scheme over a period of years. From September 2015 to May 2018, Griffin and his associates defrauded municipalities, including the village of Croton-on-Hudson and the hamlet of Verplanck, New York by submitting fake and inflated bids from other entities so that Griffin's company would be the low bidder among the purportedly competitive bids. Griffin prepared the fake bids on the letterhead of the other entities without authorization from those other entities. The parties stipulated in the plea agreement that the loss amount from this scheme was approximately $134,000.

## II.    CALCULATION OF THE OFFENSE LEVEL AND THE PSR

The parties stipulated in the Plea Agreement that the applicable offense level is 21, as calculated below. This offense level, at criminal history category I, results in an imprisonment range of 37 to 46 months and a fine range of $15,000 to $150,000.

    1.    Counts One and Two of the Information are grouped together pursuant to U.S.S.G. §3D1.2(d), since the offense level is determined largely on the basis of total loss.

    2.    Pursuant to U.S.S.G. § 3D1.3(6), since Counts One and Two of the Information are grouped together pursuant to U.S.S.G. § 3D1.2(d), the applicable guideline that produces the highest offense level is applied. As per the below, the most applicable guideline is the Guideline applicable to the offense charged in Count One of the Information, U.S.S.G. § 2Cl.1, since it produces the highest offense level.

    3.    The Guideline applicable to the offense charged in Count One of the Information is U.S.S.G. § 2C1.1.

    4.    Pursuant to U.S.S.G. § 2C1.1(a)(2), the base offense level is 12.

    5.    Pursuant to U.S.S.G. § 2C1.1(b)(2), because the loss to the government from the offense of $1,200,000 exceeded $6,500, the offense level is increased by

14 levels from the table in U.S.S.G. § 2B1.1(b)(l)(H).

6.   In accordance with the above, the total applicable Guidelines offense level for Count One is 26.

7.   The Guideline applicable to the offense charged in Count Two of the Information is U.S.S.G. § 2B1.1.

8.   Pursuant to U.S.S.G. § 2B1.1 (a)(2), the base offense level is six.

9.   Pursuant to U.S.S.G. § 2B1. l(b)(1)(E), because the actual loss amount of $134,000 was more than $95,000 but not more than $150,000, the offense level is increased by 8 levels.

10.  In accordance with the above, the total applicable Guidelines offense level for Count Two is 14.

11.  Since the total applicable Guidelines offense level for Count One is 26 and the total applicable Guidelines offense level for Count Two is 14, the most applicable guideline is the Guideline applicable to the offense charged in Count One of the Information, U.S.S.G. § 2C1.1, since it produces the highest offense level of 26.

12.  Because the defendant meets the criteria of U.S.S.G. § 4C1.1 (a), the offense level is reduced by two levels.

13.    Assuming the defendant clearly demonstrates acceptance of responsibility, to the satisfaction of the Government, through his allocution and subsequent conduct prior to the imposition of sentence, a two-level reduction will be warranted, pursuant to U.S.S.G. § 3E1.l(a).   Furthermore, assuming the defendant has accepted responsibility as described in the previous sentence, the Government will move at sentencing for an additional one-level reduction, pursuant to U.S.S.G. § 3E1.1(b), because the defendant gave timely notice of his intention to enter a plea of guilty, thereby permitting the Government to avoid preparing for trial and permitting the Court to allocate its resources efficiently.

The PSR contains the same Guidelines calculation, forfeiture amount, restitution amount,

and Guidelines fine range, as those set forth in the Plea Agreement.  (PSR ¶¶ 25-39, p. 31).[1]

---

[1] Consistent with the parties' plea agreement and the PSR, the Government will submit a proposed forfeiture order of $220,000, (Dkt. 71-1), and a restitution order for $2,400,000, with $1,200,000 to be paid to the Town of Cortlandt and $1,200,000 to be paid to the Westchester Land Trust, in advance of sentencing.  Given Griffin's conduct and his clear ability to pay, the Government is

The U.S. Probation Office, which prepared the PSR before Griffin's futile efforts at withdrawing his guilty plea, recommends a downward variance sentence of 30 months' imprisonment. (PSR at 31). Far from his position today, at the time of his interview with the U.S. Probation Office, Griffin "told the Probation Office, verbally and in writing, that he accepted responsibility for his actions and repeatedly expressed the utmost remorse to the Town of Cortlandt, his employees, and his family. A letter prepared by [former] Counsel insinuated that that the defendant's mental health was compromised at the time of the offense because of some family trauma. Consequently, Griffin was depressed and unable to sleep which compromised his judgment." (PSR at 32). In explaining its recommendation, the U.S. Probation Office noted, "these offenses occurred over several years, one of which caused costly environmental destruction. Accordingly, we propose a sentence of 30 months' imprisonment, followed by three years' supervised release." (PSR at 32). While "[a] lesser sentence was considered," the "Probation Office cannot overlook Griffin's prior conviction for similar conduct and wherein he was able to avoid prison, and we are still unable to comprehend why Griffin, who gives the impression of being respected and whose businesses are profitable, would be willing to again take a substantial risk. We trust that this sentence will promote respect for the law and continuously remind Griffin of his criminal conduct." (PSR at 32).

## III.    THE COURT SHOULD ENFORCE THE TERMS OF THE PLEA AGREEMENT

The Court should specifically enforce the Plea Agreement. Having lost his motion to withdraw his guilty plea, Griffin is now again trying unsuccessfully to back away from the Plea Agreement. By seeking departures from the Stipulated Guidelines Range and by seeking to reduce

---

also seeking a fine within the Guidelines range between $15,000 and $150,000.

17

his restitution and forfeiture amounts, Griffin has materially breached the Plea Agreement.  The appropriate remedy is specific performance.

Under the Plea Agreement, which is docket entry 129-1, Griffin pleaded guilty to a count of conspiracy to commit bribery and a count of conspiracy to commit wire fraud, both of which were to be charged in a superseding information.  In return for the defendant's guilty pleas to those offenses, the Government agreed to dismiss multiple open counts against him, which included a charge of aggravated identity theft, in violation of 18 U.S.C. § 1028A, in Count 7 of the pending underlying Indictment.  Thus, the Plea Agreement afforded Griffin with substantial benefits, including avoiding facing a significantly longer statutory maximum sentence, a mandatory minimum consecutive sentence of two years' imprisonment, and the potential for higher loss and restitution amounts as part of any sentencing guidelines calculation.

The Plea Agreement provided that the "loss to the government" was $1,200,000 and that "the defendant hereby stipulates that the loss amount sustained by victim Westchester Land Trust, a private entity, as a result of the offense is also $1,200,000."  The Plea Agreement calculated the offense level at 21 with a criminal history category of I.  That resulted in a guidelines imprisonment range of 37 to 46 months, which the Plea Agreement defined as the Stipulated Guidelines Range. The Plea Agreement then stated:

> The parties agree that neither a downward nor an upward departure from the Stipulated Guidelines Range set forth above is warranted.  Accordingly, neither party will seek any departure or adjustment pursuant to the Guidelines that is not set forth herein.  Nor will either party in any way suggest that the Probation Office or the Court consider such a departure or adjustment under the Guidelines.

The Plea Agreement also stated:

> The defendant further agrees to make restitution in the amount of $2,400,000, with $1,200,000 due to the Town of Cortlandt and $1,200,000 due to the

> Westchester Land Trust, in accordance with Title 18, United States Code, Sections 3663, 3663A and 3664. The defendant further agrees that the obligation to make such restitution shall be made a condition of probation, *see* 18 U.S.C. § 3563(b)(2), or of supervised release, *see* 18 U.S.C. § 3583(d), as the case may be. . . . The defendant will be given credit against this restitution amount for any payments made prior to sentencing, as verified by the Office.

Seeking departures, as opposed to variances, is a material breach of the plea agreement. *United States v. Cimino*, 381 F.3d 124, 127 (2d Cir. 2004) (seeking lower Guidelines range contrary to plea agreement material breach of agreement). Similarly, failing to turn over assets in violation of a plea agreement is a material breach for which the Government is entitled to relief. *See United States v. Alexander*, 869 F.2d 91, 92-96 (2d Cir. 1989).

When a defendant materially breaches a plea agreement, as here, the Government is entitled to specific performance of the plea agreement or to be relieved of its obligations under it. *United States v. Brumer*, 528 F.3d 157, 159 (2d Cir. 2008) (quoting *United States v. Byrd*, 413 F.3d 249, 251 (2d Cir. 2005)). Under the latter approach, the Government would therefore be relieved of its obligation not to pursue any additional charges, including the charge of aggravated identify theft now charged in Count 7 of the underlying Indictment. That charge carries a two-year mandatory minimum sentence that must run consecutively to any other sentence imposed. Relieving the Government of its obligations under a plea agreement in this manner does not entitle a defendant to withdraw an earlier guilty plea. *See, e.g.*, *United States v. Hazeem*, 181 F.3d 83 (2d Cir. 1999).[2]

Here, the Plea Agreement was the product of extensive discussions between the

---

[2] To be clear, specific performance is the remedy the Government is seeking. But should the Court, for whatever reason, not grant specific performance of the Plea Agreement, after Griffin is sentenced on Counts 1 and 2 of the Superseding Information, the Government would reserve its rights to consider pursuing a superseding indictment including mail fraud and mail fraud conspiracy charges and the previously agreed-to-be-dismissed counts, including the aggravated identity theft charge at Count 7 of the underlying Indictment. But again, specific performance is the remedy the Government is seeking.

Government, Griffin, and Griffin's prior counsel. The U.S. Probation Office in the PSR calculated the same Guidelines calculation, forfeiture amount, restitution amount, and Guidelines fine range, as that set forth in the Plea Agreement. The Court has already concluded that prior counsel's representation "was not constitutionally ineffective." (Dkt. 117 at 31 n.9). Similarly, Dyckman, when represented zealously by two sets of experienced counsel, likewise agreed that the Westchester Land Trust and the Town of Cortlandt each incurred losses of $1.2 million as a result of the illegal dumping scheme. As did the U.S. Probation Office in Dyckman's PSR. And the Court so found at Dyckman's sentencing in its restitution order. Finally, each of the victims agreed that $1.2 million was an appropriate restitution amount for its respective losses caused by Griffin and Dyckman's illegal dumping scheme. Indeed, both victims have pointed out that their losses might well be at least double these amounts, and so the stipulated amounts that all parties agreed to are, if anything, conservative estimates. (Dkt. 135-1, 136-1).

On this clear record, given the ample factual basis for the stipulations in the Plea Agreement, the Government thus moves for specific performance of the Plea Agreement. *Cimino*, 381 F.3d at 128 (Second Circuit holding that when, as here, "a defendant breaches his plea agreement, the Government has the option to either seek specific performance of the agreement or treat it as unenforceable"). Accordingly, the well-supported offense level, applicable Guidelines range, restitution amounts and schedule of victims, and forfeiture amount, should all be determined consistent with the Plea Agreement. In addition, there should be no sentencing departures, although Griffin may still advocate for a variance.

## IV. APPLICATION OF THE RELEVANT SECTION 3553(a) FACTORS

The Government respectfully submits that a sentence of 46 months' imprisonment, at the

top of the Stipulated Guidelines Range, would be sufficient, but not greater than necessary, to serve the purposes of sentencing. In particular, the nature and circumstances of Griffin's offense, his weak at best acceptance of responsibility, and the need to achieve specific and general deterrence and account for the devastating harm to his victims, all justify such a sentence.

### A. **Applicable Law**

As the Court is aware, the Guidelines still provide important guidance to the Court following *United States v. Booker*, 543 U.S. 220 (2005), and *United States v. Crosby*, 397 F.3d 103 (2d Cir. 2005). Indeed, although *Booker* held that the Guidelines are no longer mandatory, it also held that they remain in place and that district courts must "consult" the Guidelines and "take them into account" when sentencing. *Booker*, 543 U.S. at 264. As the Supreme Court stated, "a district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range," which "should be the starting point and the initial benchmark." *Gall v. United States*, 552 U.S. 38, 49 (2007).

Facts relied on at sentencing for the purpose of calculating the applicable Sentencing Guidelines must be established by a preponderance of the evidence. *United States v. Thorn*, 317 F.3d 107, 117 (2d Cir. 2003); *United States v. Vaughn*, 430 F.3d 518, 527 (2d Cir. 2005). Furthermore, "a sentencing court, like a jury, may base its fact-finding on circumstantial evidence and on reasonable inferences drawn therefrom." *United States v. Gaskin*, 364 F.3d 438, 464 (2d Cir. 2004). As always, the "sentencing court is afforded broad discretion in resolving disputed factual issues." *United States v. Ambrosio*, 129 F.3d 114, 1997 WL 701368, at *2, n.1 (2d Cir. 1997) (summary order) (citing *United States v. Ibanez*, 924 F.2d 427, 430 (2d Cir. 1991)). The sentencing court "is entitled to rely on any type of information known to it" in resolving sentencing

21

disputes. *United States v. Tracy*, 12 F.3d 1186, 1203 (2d Cir. 1993) (citing *United States v. Carmona*, 873 F.2d 569, 574 (2d Cir. 1989)). At a sentencing hearing, the Federal Rules of Evidence do not apply, and the Court is not bound by rules governing hearsay, so long as the basis for the court's determination has indicia of reliability and is not otherwise contrary to a defendant's due process rights. *See United States v. Fatico*, 579 F.2d 707, 711 (2d Cir. 1978); *see also United States v. Martinez*, 413 F.3d 239, 242 (2d Cir. 2005). Rather, "[a]ny information or circumstance shedding light on the defendant's background, history and behavior may properly be factored into the sentencing determination." *Carmona*, 873 F.2d at 574 (citing *Williams v. New York*, 337 U.S. 241, 250–51 (1949)).

After that sentencing Guidelines calculation, however, a sentencing judge must consider seven factors outlined in Title 18, United States Code, Section 3553(a): (1) "the nature and circumstances of the offense and the history and characteristics of the defendant"; (2) the four legitimate purposes of sentencing, as set forth below; (3) "the kinds of sentences available"; (4) the Guidelines range itself; (5) any relevant policy statement by the Sentencing Commission; (6) "the need to avoid unwarranted sentence disparities among defendants"; and (7) "the need to provide restitution to any victims." 18 U.S.C. § 3553(a)(1)-(7); *see also Gall*, 552 U.S. at 50 & n.6.

In determining the appropriate sentence, the statute directs judges to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing, which are:

(A)    to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
(B)    to afford adequate deterrence to criminal conduct;
(C)    to protect the public from further crimes of the defendant; and
(D)    to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a)(2).

With respect to restitution, as the Second Circuit has explained, when a court determines the amount of restitution, "the calculation of these losses need not be mathematically precise." *United States v. Rivernider*, 828 F.3d 91, 115 (2d Cir. 2016). A district court must make only "a reasonable estimate" of a victim's loss "based on the evidence before it." *United States v. Milstein*, 481 F.3d 132, 137 (2d Cir. 2007); *see also United States v. Gushlak*, 728 F.3d 184, 196 (2d Cir. 2013) ("[A] reasonable approximation will suffice, especially in cases in which an exact dollar amount is inherently incalculable.").

Extreme deference on appeal to a trial court's determination of restitution is warranted "because ordering restitution requires a delicate balancing of diverse, sometimes incomparable, factors, some of which not only lack certainty but may indeed be based on mere probabilities, expectations, guesswork, even a hunch." *United States v. Rossi*, 592 F.3d 372, 376 (2d Cir. 2010); *see also United States v. Ismail*, 219 F.3d 76, 78 (2d Cir. 2000) ("Because a restitution order requires a delicate balancing of diverse, sometimes incomparable factors, . . . the sentencing court is in the best position to engage in such balancing, and its restitution order will not be disturbed absent abuse of discretion."). A district court has "power to address practical problems in the implementation of restitution orders . . . ." *United States v. Park*, 33 F. App'x 1, 2 (2d Cir. 2002).

### B.    The Nature and Circumstances of the Offense

The aggravating aspects of the nature and circumstances of the defendant's offenses make him more culpable, and more deserving of punishment, than other defendants, including his co-defendant Dyckman, who have committed similar crimes.

The offense conduct here, which encompasses two independent corrupt fraud schemes, is

23

serious.  Each of the two schemes actually consisted of numerous separate acts.  Over and over, Griffin dumped hundreds (over 300) unauthorized truckloads of construction debris at Arlo Lane. Griffin was aware that Dyckman took steps to conceal Griffin's dumping, including redirecting the supervisor away from Arlo Lane so that the dumping would not be discovered.  In return, he bribed Dyckman on several occasions with cash.  Each of the fake bids similarly required numerous separate acts to prepare and send the bids out.  Both schemes required detailed planning. Neither scheme was aberrant or a fleeting lapse in judgment.

The dumping scheme also involved the corruption of a public employee because it required unauthorized access to, and misuse of, public property, misleading other public employees, and making false entries in the Town's payroll records.  That Griffin so willingly corrupted a senior Town of Cortlandt employee to get what he wanted should be a significantly aggravating factor in fashioning his sentence.

> "[C]orruption is a crime that does not just victimize individuals and does not just take money wrongfully from the public fisc.  Corruption attacks the very heart of our system of government.  The doubt that many Americans harbor about whether our public servants are operating in their own interests or whether their vote is available for purchase to the highest bidder is magnified every time a [public employee] is revealed to be corrupt.

*United States v. Silver*, No. 15 Cr. 93 (VEC) (July 27, 2018) (ECF No. 460, Sent'g Tr., at 42)(remarks of Judge Caproni).  Similarly, Judge Caproni observed in sentencing a New York City Housing Authority ("NYCHA") employee that public corruption is "one of the most serious of all federal offenses" because "[t]his country cannot exist if the public does not trust that public officials are operating as servants of the people and not corruptly for their own personal gain."  *United States v. Rupnarain*, No. 24 Cr. 125 (VEC), Dkt. 28 at 25 (S.D.N.Y. Aug. 5, 2024); *see also id.* at 26 ("I think society expects public corruption to be treated seriously and for corrupt

24

officials to be punished.").  Judge Cote, in sentencing a different NYCHA employee, remarked:

> And corruption is a corrosive, destructive issue.  People need to have faith in their government.  They need to have faith in their public housing that it's a community resource that can be used to support those in need.

*United States v. Figueroa*, No. 22 Cr. 605 (DLC), Dkt. 27 at 17 (S.D.N.Y. Feb. 9, 2023).

As another example, Judge Oetken observed in sentencing a different NYCHA defendant

who took bribes that:

> It's the kind of conduct that undermines faith in our government and in institutions that are supposed to help people.  It is criminal conduct that is hard to detect.  It's more subtle than some others forms of criminal conduct, but there are real victims; not just NYCHA but sort of the public's faith in the government.  It creates cynicism, this sort of corruption.

*United States v. Escobar*, No. 24 Cr. 213 (JPO), Dkt. 23 at 25-26 (S.D.N.Y. July 25, 2024).

While Dyckman was the public employee here, a corrupt public employee only becomes

corrupt because someone else offers him a bribe to get something they want.  Here, Griffin is the

more culpable of the two because he was the one who initiated each occasion in which debris was

improperly dumped at Arlo Lane and he was the one who knowingly bribed the public employee.

That difference in culpability is evident from the benefits Griffin received as compared to

Dyckman.  In return for $1,500 in cash, Griffin received approximately $170,000 for hauling his

debris from Arlo Lane plus his savings from not having to truck his hundreds of loads of debris to

a legal dumping site.[3]  Dyckman used the cash he received in part to buy food.  (November 19,

2018 text in which Dyckman said "I'm seeing Glenn today I'll have money for food today.")  For

Griffin, the amounts he pocketed as a result of the scheme became a small part of his reported

$42.7 million net worth.  (PSR ¶ 66).  Last week, Dyckman also received a prison term for his

---

[3] Griffin also received $50,000 from his bid-rigging scheme.

participation in the scheme.  In his sentencing memo filed a day later, Griffin asked for a non-custodial sentence that he wants to buy with donated landscaping projects on public properties.

Another aggravating factor here is that both schemes arose out of greed.  Given Griffin's success in business, he hardly needed the money he saved by dumping at Arlo Lane or receiving work from the fake bids.  The proceeds he received were essentially a rounding error on his financial statements.  Griffin's offense conduct clearly did not arise from any need; rather, it appears to be the product of an unusual degree of greed.

Among the most serious aspects of Griffin's conduct is the harm he caused his victims, who have not yet received a cent of restitution.  As part of sentencing, one victim, the Town of Cortlandt, is owed $1.2 million, and submitted a victim impact statement discussing the devastating impact of Griffin's illegal dumping scheme.  (Dkt. 136-1).

Another victim, the Westchester Land Trust, is owed the same amount and has given a statement of its own recounting the harm that Griffin caused it.  This victim statement provides the Court with powerful evidence of the serious and lasting harm of Griffin's crimes and the need to justly punish him.  The Government highlights portions of the victim statement below, which notes that Westchester Land Trust "has suffered extensive, costly losses."  (Dkt. 135-1).

> Westchester Land Trust is a 501(c)(3) non-profit organization accredited by the Land Trust Accreditation Commission, with an office located in Bedford Hills, New York.  Westchester Land Trust is committed to the protection and conservation of natural resources within New York State.  Accordingly, Westchester Land Trust works with public and private partners to preserve land and enhance natural resources in Westchester and eastern Putnam Counties, including by accepting ownership of parcels of land with full responsibility for their perpetual management and protection. . . .
>
> McGregor Pond Preserve (the "Preserve") is a 109-acre nature preserve owned and protected by Westchester Land Trust and thus comprises almost 10% of our owned preserves, where we are 100% financially responsible for maintaining their

environmental integrity.  The Preserve is located within the Croton to Highlands Biotic Corridor, designated as such for its essential contributions to biodiversity in the area.  Positioned within a 70-acre subwatershed of Peekskill Hollow Creek, the ecological features of the Preserve include vast wetlands, including a red maple swamp, mature upland woodlands, and open water.  Water resources within the Preserve include the approximately nine-acre Gregory Pond, as well as ephemeral seeps and springs at the base of adjoining uplands.  Waters drain generally to the northwest, then westerly via McGregory Brook, where they join other small tributaries to Peekskill Hollow Creek, and eventually the Hudson River via Annsville Cove.  The New York State Department of Environmental Conservation found that the Preserve is in the top one percent for wetlands protection and top five percent for riparian habitat protection compared to other forest patches in the Hudson Valley.

The Preserve borders the Town of Cortlandt's ("Town") Highway Division property.  On the Town's side of the boundary is Arlo Lane, the location of the Defendants' unauthorized and illegal dumping scheme.

In August 2022, Westchester Land Trust learned of the Indictment, and thereafter discovered a two-story high pile of surreptitiously and illegally dumped materials on the Preserve.  The materials include construction debris such as thick concrete, cement with rebar, metal, tiles, bricks, textiles, and paint and caulk cans.  Initial testing performed by the NYSDEC and the New York State Department of Labor indicated that asbestos containing materials are also present in the dumped materials.

Because Westchester Land Trust is 100% charged with protecting the Preserve— and because of the presence of hazardous materials—remediation is necessary.  To do so, Westchester Land Trust must first confirm the hazardous nature and distribution of the illegally dumped materials via further sampling and analysis.  Then, Westchester Land Trust must secure state permits to remove the materials from the wetland and to remediate and restore the Preserve to its pre-dumping state.  The time and expense associated with this obligated endeavor will be a significant drain on our limited resources (financially and from a personnel perspective) . . . .  The environmental destruction, remediation and restoration burden, legal fees, and personnel costs—including diverting resources from other stewardship and land protection activities to monitor the property and document the damages—directly result from the illegal conduct of the Defendants . . . .

. . . . We ask that the Court order restitution as part of the sentence imposed on each Defendant, in accordance with the respective plea agreements between the Defendants and the Government, in order that Westchester Land Trust may begin the costly and necessary process of cleaning up the Preserve from the Defendants' . . . hazardous dumping, for the benefit of the public for generations to

27

come.

(Dkt. 135-1). In light of the harms experienced by Griffin's victims, the requested sentence is necessary to reflect the seriousness of the offense and to provide just punishment

### C.    Under History and Characteristics of the Defendant

#### 1.    Under Prior Federal Conviction

On or about October 6, 1998, the defendant was convicted in the U.S. District Court for the Southern District of New York of (a) conspiracy to defraud the United States, in violation of Title 18, United States Code, Section 371, and (b) sale or receipt of stolen goods, securities, moneys, or fraudulent State tax stamps, in violation of Title 18, United States Code, Section 2315, for which he was sentenced to a term of probation of 4 years, 6 months in home confinement, a $20,000 fine, and a $200 special assessment. (PSR ¶ 38). Although Griffin received no criminal history points for this old conviction, it is concerning that after receiving a rare, noncustodial sentence for a federal crime in this District, Griffin does not appear to have learned his lesson. Unlike Griffin, Dyckman had no prior federal conviction. As the U.S. Probation Office observed, it "cannot overlook Griffin's prior conviction for similar conduct and wherein he was able to avoid prison." (PSR at 32). Nor should this Court. Specific deterrence thus weighs in favor of the requested sentence of 46 months' imprisonment.

#### 2.    Under Weak Acceptance of Responsibility

While the Government is seeking the same sentence of 46 months' imprisonment regardless of whether the Court gives Griffin credit under the Guidelines for acceptance of responsibility, there can be no serious doubt that the defendant has not fully accepted responsibility for what he has done. Instead, the defendant has attempted to minimize his conduct, has offered

irrelevant excuses and, in some instances, has made false statements in an effort to escape the consequences of his crimes.

The Guidelines range set forth in the Plea Agreement included a three-point reduction for acceptance of responsibility pursuant to U.S.S.G. §§ 3E1.1(a) and (b).  As expressly stated in the parties' Plea Agreement, these points for acceptance of responsibility were contingent upon the defendant's "subsequent conduct prior to the imposition of sentence."  Where a defendant pleads guilty and thereafter acts in ways entirely contrary to an acceptance of responsibility, the Court has considerable discretion to find that the defendant is no longer entitled to a reduction in points. *See, e.g.*, *United States v. Hirsch*, 239 F.3d 221, 226 (2d Cir. 2001) (upholding district court's decision to deny acceptance of responsibility credit where defendant's attempt to withdraw his plea "effectively recanted" his admission of guilt); *United States v. Cox*, No. 98-CR-850, 2001 WL 920260, at *11–12 (E.D.N.Y. Aug. 3, 2001), *aff'd*, 299 F.3d 143 (2d Cir. 2002).[4]

Here, at the defendant's plea hearing, he initially denied that he had agreed to an illegal dumping scheme.  Instead, he claimed that he "gave Bobby Dyckman a couple hundred bucks a few times around the holidays as . . . [a] gratuity."  He claimed that he "had permission for years and years and years" to, apparently, dump at Arlo Lane and it involved only "a few hundred dollars a couple of times."  With respect to the fake bids, he said "I did ask people over time to help me just because I was - I had relationships with people, and I did ask other people to put in some bids."  But, he added, he "didn't do it with all the ones that they said" and he did not do "anything illegal" with the bids.

Then, after pleading guilty, the defendant filed a motion to withdraw his guilty plea

---

[4] Were the Court to deny Griffin those three acceptance points, his Guidelines range would expand to 51 to 63 months' imprisonment.

wherein he sought to disavow his plea allocution by making a series of implausible assertions. The defendant continued to make false statements under oath at the hearing on his motion to withdraw his guilty pleas. As the Court noted in its opinion denying the motion, Griffin claimed that his prior counsel assured him he would avoid a prison sentence but also pressured him to plead guilty because the Government's case was ironclad. As the Court noted, "Griffin cannot have it both ways." The Court also noted that the evidence belied Griffin's claim that his prior counsel did not review the entire plea agreement with him in advance of the plea hearing. The Court described how prior counsel and his associate both testified that prior counsel had spoken with Griffin about the plea agreement "a few dozen times" between receiving the document and the plea hearing 20 days later. The Court concluded that given this evidence, along with Griffin's "demonstrated vigor in participating in his defense, it would defy common sense to find that they never discussed the provisions on the plea agreement." The Court also found that Griffin was "simply not credible" when he testified that he did not discuss the questions that his prior counsel asked him at the plea hearing that made up his allocution and that, instead, his counsel told him to just respond yes to any questions he was asked.

A defendant's failure to tell the whole truth about the extent of participation in his offense is grounds for denying an adjustment under U.S.S.G. § 3E1.1 for acceptance of responsibility, even where the defendant has pleaded guilty. *United States v. Reyes,* 13 F.3d 638, 640 (2d Cir. 1994).

Even if the Court concludes that Griffin's conduct meets the technical requirements to receive acceptance of responsibility credit under the Guidelines, the Government submits that the Court may consider the *quality* of that acceptance in considering whether to vary and the extent of

that variance, or where within the applicable Guidelines range a sentence of imprisonment should fall. The provision is designed to reward a defendant's admission of responsibility as the first step toward rehabilitation. *United States v. Parker,* 903 F.2d 91, 105 (2d Cir. 1990). Logically, a defendant who admits full responsibility for his conduct is likely to be more easily supervised and less likely to recidivate. The Court should consider the defendant's false statements and efforts to minimize when fashioning its sentence.

In all events, the Government seeks the same sentence of 46 months' imprisonment.

### 3.  The Defendant Has Not Shown He is Entitled to a Variance

The defendant has not shown that he is entitled to a variance due to family circumstances or to the potential impact on his businesses if he is incarcerated.

The defendant has not identified any significantly unusual or uncommon impact of a potential prison sentence on his family. His two children are college students. His wife is a registered nurse. Given the defendant's net worth, his absence would not have any negative financial impact on the family. While the defendant argues that his two children are anxious about his sentencing, that is hardly uncommon. No family member appears to have any special needs that only the defendant can handle.

Having used his landscaping business to commit his crimes, the defendant now relies on his business in a bid for leniency by arguing that his businesses would fail and his employees would be unemployed in his absence. The Court of Appeals has expressed doubt about the weight a sentencing court should place on such an argument in these circumstances. *See United States v. Rattoballi*, 452 F.3d 127, 136 (2d Cir. 2006) (:Moreover, we are disinclined to accord the prospect of business failure decisive weight when it is a direct function of a criminal investigation that had

31

its origins in the defendant's own unlawful conduct.").  Further, the defendant has also not shown that he alone is so essential to Hilltop Masonry & Landscaping or its related entities that it would "collapse" in a "swift and devastating" way in his absence, as he claims.  According to the defendant's sentencing memo, the entities now controlled by the defendant have 50 employees other than the defendant, "many of whom have worked with Mr. Griffin for decades."[5]  As the owner, the defendant is naturally involved in every aspect of the business and may very well be more experienced and capable at running all those aspects than any other employee.  But the defendant has not demonstrated that some subset of those employees, with their decades of experience in the landscaping industry, cannot run the business.

Further, the defendant has known for certain since late August 2024 that his sentencing date was approaching and that he faced a prison sentence.  He therefore has had sufficient notice to train others to run the business in his absence or to find someone else who could take his place.  *See United States v. Fishman*, 631 F.Supp.2d 399, 406 (S.D.N.Y. 2009) (defendant's employer had "more than ample time to prepare for a possible transition" away from the defendant).  The businesses appear to be successful and the defendant has more than sufficient means to support them through financial difficulties, to train employees to run the business in his absence or to find a replacement.  *See United States v. Vandebrake*, 771 F. Supp. 2d 961, 998 (N.D. Iowa 2011) (no departure based on possible impact of defendant's absence because his business was in an "excellent position" to find a new manager due to its financial strength).

The cases cited by the defense demonstrate how extraordinary the circumstances must be

---

[5] As the defendant explained in his sentencing memo, he no longer controls Griffin's Landscaping and, therefore, is no longer responsible for its 80 employees.  The defendant's argument that "over one hundred employees rely" on him appears to be misleading.

before a departure and, by analogy, a variance based on the impact of the defendant's absence on a business would be justified. In *United States v. Milikowsky*, 65 F.3d 4 (2d Cir. 1995), the defendant received a one level departure from a level 11, which at the time required some imprisonment, to a level 10, which did not. The defendant demonstrated to the sentencing court's satisfaction that he really did have unique skills and experience and that his two companies were in such precarious financial condition that they would fail in his absence, thus putting 150 to 200 employees out of work. *Id.* at 6-9. The defendant here is seeking a much greater variance under circumstances that are less compelling for the reasons described above. In *United States v. Toback*, 2005 WL 992004 (S.D.N.Y. 2005), the court varied from a 10 to 16 month range to time served where that offense was the defendant's first conviction, he accepted responsibility for his offense, and his offense spanned a short period of time and involved minimal planning. Griffin can say none of those things. The defendant in *Toback* demonstrated he was "essential to the successful operations" of his business. *Id.* at 5-6. While Griffin is obviously an important player in his business, he is not essential for the reasons stated above. Judge Weinstein varied in *United States v. Khalid*, 2011 WL 6967993 (E.D.N.Y. 2011) because the defendant had no prior criminal history and supported his wife, five children, and his parents with the income from his several businesses. Griffin can say none of those things, as his net worth is more than sufficient to support his wife and college age children without income from his businesses.

The defendant has submitted a number of letters from his friends and family members and from those whom he has helped in the past. While many of the letters describe positive things the defendant has done, and the Court should consider them, they should not be as significant in determining the defendant's sentence as the defendant suggests. Courts recognize that it is the

norm for professionally successful defendants to be involved in charitable works.  *See, e.g.*, *United States v. Barbera*, 2005 WL 2709112 at * 12-13 (S.D.N.Y. 2005) (citing *United States v. McClatchey*, 316 F.3d 1122, 1135 (10th Cir. 2003)) (community involvement not out of the ordinary for high ranking businessmen; "[l]ikewise, excellent character references are not out of the ordinary [for white collar defendant]; one would be surprised to see a person rise to an elevated position in business if people did not think highly of him or her");  *United States v. Kolbach*, 38 F.3d 832, 838 (6th Cir. 1994) ("it is *usual* and *ordinary*, in the prosecution of white-collar crimes involving high-ranking corporate executives . . . to find that a defendant was involved as a leader in community charities . . . and church efforts") (emphasis in original); *United States v. Haversat*, 22 F.3d 790, 796 (8th Cir. 1994) ("high-level business executives . . . enjoy sufficient income and community status so that they have the opportunities to engage in charitable and benevolent activities").

### D.    Deterrence and the Need for the Sentence to Promote Respect for the Law

The defendant's offenses were serious for the reasons stated above.  A Guideline sentence is therefore necessary "to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense."  18 U.S.C. § 3553(a)(2)(A).

One of the paramount factors that the Court must consider in imposing sentence under Section 3553(a) is the need for the sentence to "afford adequate deterrence to criminal conduct." 18 U.S.C. § 3553(a)(2)(B).  Courts have generally recognized that "white collar crime . . . requires heavy sentences to deter because it is potentially very lucrative."  *United States v. Hauptman*, 111 F.3d 48, 52 (7th Cir. 1997); *see also Harmelin v. Michigan*, 501 U.S. 957, 988 (1991) (noting that "since deterrent effect depends not only upon the amount of the penalty but upon its certainty,

crimes that are less grave but significantly more difficult to detect may warrant substantially higher penalties"). "Because economic and fraud-based crimes are more rational, cool, and calculated than sudden crimes of passion or opportunity, these crimes are prime candidates for general deterrence." *United States v. Martin*, 455 F.3d 1227, 1240 (11th Cir. 2006) (internal quotation omitted). "Defendants in white collar crimes often calculate the financial gain and risk of loss, and white collar crime therefore can be affected and reduced with serious punishment." *Id.*; *see also United States v. Heffernan*, 43 F.3d 1144, 1149 (7th Cir. 1994) ("Considerations of (general) deterrence argue for punishing more heavily those offenses that either are lucrative or are difficult to detect and punish, since both attributes go to increase the expected benefits of a crime and hence the punishment required to deter it.").

As in Dyckman's case, the need for general deterrence is acute here. Griffin took multiple steps to corrupt a supervisory public official, evade detection, and defraud several municipalities. This Court's sentence should send a strong and clear message to others that efforts to corrupt a public official, especially when those efforts harm victims and cause environmental damage, will be met with serious consequences.

### E.  Need to Avoid Unwarranted Sentencing Disparities

Finally, a sentence along the lines requested by the defendant would create an unwarranted sentencing disparity. As the Second Circuit has explained, "we have repeatedly made clear that 'section 3553(a)(6) requires a district court to consider nationwide sentence disparities, but does not require a district court to consider disparities between co-defendants.'" *United States v. Ghailani*, 733 F.3d 29, 55 (2d Cir. 2013) (quoting *United States v. Frias*, 521 F.3d 229, 236 (2d Cir. 2008)). Here, the PSR's summary of the U.S. Sentencing Commission's Judiciary Sentencing

Information data, which analyzed the sentences imposed on the 44 defendants with the same final offense level, 21, and Criminal History Category, I, as Griffin over the last five fiscal years (FY2019-2023), indicates that the average sentence imposed was 23 months and the median sentence imposed was 24 months.  (PSR at 28).  Accordingly, based on Griffin's conduct, which is based on victims' actual losses (and not some far-flung estimate of intended loss), his weak (at best) acceptance of responsibility, the fact that his prior federal conviction in this District counts for zero criminal history points, and the sentences imposed over the last five fiscal years on the 44 defendants with the same final offense level and Criminal History Category as Griffin, to sentence Griffin along the lines he requests would create an unwarranted sentencing disparity.

## IV.     CONCLUSION

For the reasons set forth above, the Government respectfully requests that the Court grant its request for specific performance of the terms of the Plea Agreement and impose a sentence of (a) 46 months' imprisonment, at the top of the Stipulated Guidelines Range, (b) the stipulated $220,000 forfeiture amount, (c) the stipulated restitution amount of $2,400,000, with $1,200,00 due to the Town of Cortlandt and $1,200,000 due to the Westchester Land Trust, and (d) a fine within the Guidelines range between $15,000 and $150,000.

Dated: White Plains, New York
      May 28, 2025

Respectfully submitted,

JAY CLAYTON
United States Attorney

By:    /s/_____
David R. Felton
James F. McMahon
Assistant United States Attorneys
Tel: 212-637-2299/ 914-993-1936

cc: Defense Counsel (by ECF)